KAVANAUGH, Circuit Judge,
dissenting:
The Federal Trade Commission continues to seek a preliminary injunction to block further implementation of the Whole Foods-Wild Oats merger as anticompeti-tive under § 7 of the Clayton Act. As in many antitrust cases, the analysis comes down to one issue: market definition. Is the relevant product market here all supermarkets? Or is the relevant product market here only so-called “organic supermarkets”? If the former, as Whole Foods argues, the Whole Foods-Wild Oats merger would be lawful because it would not lessen competition in the broad market of all supermarkets: Whole Foods and Wild Oats together operate about 300 of the approximately 34,000 supermarkets in the United States. If the latter, as the FTC contends, the merger may be unlawful: Whole Foods and Wild Oats are the only significant competitors in the alleged organic-store market and their merger would substantially lessen competition in such a narrowly defined market.
A year ago, after a lengthy evidentiary hearing and in an exhaustive and careful opinion, the District Court found that the record evidence overwhelmingly supports the following conclusions: Whole Foods competes against all supermarkets and not just so-called organic stores; the relevant market for evaluating this merger for antitrust purposes is all supermarkets; and the merger of Whole Foods and Wild Oats would not substantially lessen competition *892 in a market that includes all supermarkets. The court therefore denied the FTC’s motion for a preliminary injunction.
And nearly a year ago, a three-judge panel of this Court unanimously denied the FTC’s request for an injunction pending appeal, thereby allowing the Whole Foods-Wild Oats deal to close. Since then, the merged entity has shut down, sold, or converted numerous Wild Oats stores and otherwise effectuated the merger through many changes in supplier contracts, leases, distribution, and the like.
But today the panel majority seeks to unring the bell. In my judgment, this Court got it right a year ago in refusing to enjoin the merger, and there is no basis for a changed result now. To justify the different outcome, the majority opinion suggests that the standard we applied a year ago in considering the motion for an injunction pending appeal of the denied preliminary injunction was different from the standard we apply today in reviewing the denied preliminary injunction. But in this context, the two standards converge. Both a year ago and today, the same central question has been before the Court in determining whether to approve an injunction: whether the FTC demonstrated the necessary “likelihood of success” on its § 7 case. A year ago, the Court said no. Today, the Court says yes. The now-merged entity and the markets no doubt will be confused if not bewildered by this apparent judicial about-face.
In any event, putting aside what happened before, we should affirm the District Court’s decision denying a preliminary injunction. As the District Court concluded, the record evidence convincingly shows that Whole Foods competes vigorously against all supermarkets, not just other so-called organic supermarkets. The record contains insufficient evidence to support the FTC’s theory that so-called organic supermarkets are their own separate market and that Whole Foods therefore would be able to significantly increase prices as a result of this merger. That should end this case.
In arguing otherwise, the FTC commits the basic antitrust mistake of confusing (i) product differentiation (which is how a seller such as Whole Foods competes within a market) and (ii) separate product markets. Discerning the difference in a particular case usually turns on pricing information. Here, the pricing evidence shows that Whole Foods prices did not differ based on the presence or absence of a Wild Oats in the area and that conventional supermarkets constrain Whole Foods prices. The relevant product market therefore is all supermarkets.
On a different tack, the FTC touts its own statutorily assigned role in antitrust merger enforcement, and the agency says that the District Court applied the wrong standard to the FTC’s request for a preliminary injunction. With all due respect, I do not believe that the law allows the FTC to just snap its fingers and block a merger. “Merger enforcement, like other areas of antitrust, is directed at market power.” FTC v. H.J. Heinz Co., 246 F.3d 708, 713 (D.C.Cir.2001) (internal quotation marks omitted). And even at the preliminary injunction stage, our precedents expressly require that the FTC show a “likelihood of success on the merits.” Id. at 714.[3] At the preliminary injunction stage, *893 therefore, the FTC needs to come forward with some solid evidence that the post-merger company could profitably impose a “small but significant and nontransitory increase in price,” typically meaning a five percent or greater price increase. Horizontal Merger Guidelines § 1.11 (internal quotation marks omitted); see 15 U.S.C. § 18. As the District Court concluded, the FTC did not come close to presenting that kind of evidence in this case; it completely failed to make the economic showing that is Antitrust 101. Unbowed by the lack of economic underpinnings to the FTC’s case, the FTC’s counsel actually said at oral argument that the merger should be blocked even if there is no separate organic-stores market, a rather stunning suggestion at odds with modern antitrust law. Tr. of Oral Arg. at 17. By seeking to block a merger without a plausible showing that so-called organic stores constitute a separate product market and that the merged entity could impose a significant and nontransitory price increase, the FTC’s position calls to mind the bad old days when mergers were viewed with suspicion regardless of their economic benefits. See generally Robert H. Bork, The Antitrust Paradox (1978).
In short, I agree with and would affirm the District Court’s excellent decision denying the FTC’s motion to enjoin the merger of Whole Foods and Wild Oats. See FTC v. Whole Foods Mkt., Inc., 502 F.Supp.2d 1 (D.D.C.2007). In this dissenting opinion, I will not attempt to replicate the District Court’s lengthy description of the evidence and its thorough analysis; I will simply address the key points that are dispositive in what I find to be a straightforward case.
I
A
Section 7 of the Clayton Act prohibits mergers “where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.” 15 U.S.C. § 18. The Horizontal Merger Guidelines jointly promulgated by two Executive Branch agencies (the Department of Justice and the FTC) implement that statutory directive and recognize that the key initial step in the analysis is proper product-market definition. See Horizontal Merger Guidelines § 1.11; see also 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 536, at 284-85 (3d ed.2007). Proper product-market analysis focuses on products’ interchangeability of use or cross-elasticity of demand. A product “market can be seen as the array of producers of substitute products that could control price if united in a hypothetical cartel or as a hypothetical monopoly.” Id. ¶ 530a, at 226. In the merger context, the inquiry therefore comes down to whether the merged entity could profitably impose a “small but significant and nontransitory increase in price” typically defined as five percent or more. See Horizontal Merger Guidelines § 1.11 (internal quotation marks omitted). If the merged entity could profitably impose at least a five percent price increase (because the price increase would not cause a sufficient number of consumers to switch to substitutes outside of the alleged product market), then there is a distinct product market and the proposed merger likely would substantially lessen competition in that market, in violation of § 7 of the Clayton Act.
In considering whether the merged entity could increase prices, courts of course recognize that “future behavior must be inferred from historical observations.” Areeda & Hovenkamp, Antitrust Law ¶ 530a, at 226. Therefore, the courts scrutinize existing markets to assess the probable effects of a merger.
*894 This approach was applied sensibly by Judge Hogan in his thorough and leading opinion in FTC v. Staples, 970 F.Supp. 1066 (D.D.C.1997). There, Judge Hogan found that office products sold by an office superstore were functionally interchangeable with office products sold at other types of stores, but he nonetheless found that office-supply superstores constituted a distinct product market. One key fact led Judge Hogan to that conclusion: In areas where Staples was the only office superstore, it was able to set prices significantly higher than in areas where it competed with other office superstores (Office Depot and OfficeMax). See id. at 1075-76. For example, the FTC presented “compelling evidence” that Staples’s prices were 13 percent higher in areas where no office-superstore competitors were present. Id. Judge Hogan ultimately concluded that “[t]his evidence all suggests that office superstore prices are affected primarily by other office superstores and not by non-superstore competitors.” Id. at 1077 (emphasis added). For that reason, he enjoined the merger of Staples and Office Depot.
B
Consistent with the statute, the Executive Branch’s Merger Guidelines, and Judge Hogan’s convincing opinion in Staples, the District Court here carefully analyzed the economics of supermarkets, including so-called organic supermarkets. The court considered whether Whole Foods charged higher prices in areas without Wild Oats than in areas with Wild Oats. After an evidentiary hearing and based on a painstaking review of the evidence in the record, the court concluded that “Whole Foods prices are essentially the same at all of its stores in a region, regardless of whether there is a Wild Oats store nearby.” FTC v. Whole Foods Mkt., Inc., 502 F.Supp.2d 1, 22 (D.D.C.2007). That factual conclusion was supported by substantial evidence offered by Dr. Scheff-man, Whole Foods’s expert, and by the lack of any credible evidence to the contrary.
Dr. Scheffman analyzed Whole Foods’s actual prices across stores and concluded that “there is no evidence that [Whole Foods] and [Wild Oats] price higher” where they face no competition from so-called organic supermarkets compared with where they do face such competition. Scheffman Expert Report ¶ 292, at 113. At a regional level, his studies revealed that only a “very small percentage” of products vary in price within a region, indicating that “prices are set across broad geographic areas.” Id. ¶ 300, at 116. He also analyzed prices at the individual store level, examining how many products sold at a specific store have prices that differ from the most common price in the region. He found that “differences in prices across stores are generally very small (less than one half of one percent) and there is no systematic pattern as to the presence or absence of [organic-supermarket] competition.” Id. ¶ 305, at 118.
Moreover, the record evidence in this case does not show that Whole Foods changed its prices in any significant way in response to exit from an area by Wild Oats. In the four cases where Wild Oats exited and a Whole Foods store remained, there is no evidence in the record that Whole Foods then raised prices. Nor was there any evidence of price increases after Whole Foods took over two Wild Oats stores.
The facts here contrast starkly with Staples, where Staples charged significantly different prices based on the presence or absence of office-superstore competitors in a particular area. The evidence there showed that Staples charged prices 13 percent higher in markets without office-superstore competitors than in markets with *895 such competitors. There is nothing remotely like that in this case.
In the absence of any evidence in the record that Whole Foods was able to (or did) set higher prices when Wild Oats exited or was absent, the District Court correctly concluded that Whole Foods competes in a market composed of all supermarkets, meaning that “all supermarkets” is the relevant product market and that the Whole Foods-Wild Oats merger will not lessen competition in that product market.
In addition to the all-but-dispositive price evidence,[4] the District Court identified other factors further demonstrating that the relevant market consists of all supermarkets.
First, the record shows that Whole Foods makes site selection decisions based on all supermarkets and checks prices against all supermarkets, not only so-called organic supermarkets. As Dr. Scheffman concluded, Whole Foods “price checks a broad set of competitors ... nationally, regionally and locally.” Id. ¶ 224, at 86. This “demonstrates that [Whole Foods] views itself as competing with a broad range of supermarkets and that these supermarkets, in fact, constrain the prices charged by [Whole Foods].” Id. Those other supermarkets include conventional supermarkets such as Safeway, Al-bertson’s, Wegman’s, HEB, and Harris Teeter, as well as so-called organic supermarkets like Wild Oats. Id. ¶¶ 225-26, at 86-87. As Professors Areeda and Hoven-kamp have explained, a “broad-market finding gains some support from longstanding documents indicating that A or B producers regard the other product as a close competitor.” Areeda & Hovenkamp, Antitrust Law ¶ 562a, at 372. The point here is simple: Whole Foods would not examine the locations of and price check conventional grocery stores if it were not a competitor of those stores. Whole Foods does not price check Sports Authority; Whole Foods does price check Safeway.
Second, the record demonstrates that conventional supermarkets and so-called organic supermarkets are aggressively competing to attract customers from one another. After reviewing a wide variety of industry information and trade journals, Dr. Scheffman concluded that “‘[o]ther’ supermarkets are competing vigorously for the purchases made by shoppers at [Whole Foods] and [Wild Oats].” Scheffman Expert Report ¶ 212, at 77. Whole Foods “recognizes the fact that it has to appeal to a significantly broader group of consumers than organic and natural focused consumers.” Id. ¶ 279, at 108. The record shows that Whole Foods has made progress: Most products that Whole Foods sells are not organic. Conversely, conventional supermarkets have shifted towards “emphasizing fresh, ‘natural’ and organic” products. Id. ¶215, at 80. “[M]ost of the major chains and others are expanding into private label organic and natural products.” Id. ¶ 220, at 85; see also id. ¶ 219, at 83-85 (listing changes in other supermarkets).
So the dividing line between “organic” and conventional supermarkets has been blurred. As the District Court aptly put it, the “train has already left the station.” Whole Foods, 502 F.Supp.2d at 48. The convergence undermines the threshold premise of the FTC’s case. This is an industry in transition, and Whole Foods has pioneered a product differentiation that in turn has caused other supermarket *896 chains to update their offerings. These are not separate product markets; this is a market where all supermarkets including so-called organic supermarkets are clawing tooth and nail to differentiate themselves, beat the competition, and make money.
The District Court’s summary of the evidence warrants extensive quotation:
In sum, while all supermarket retailers, including Whole Foods, attempt to differentiate themselves in some way in order to attract customers, they nevertheless compete, and compete vigorously, with each other. The evidence before the Court demonstrates that conventional or more traditional supermarkets today compete for the customers who shop at Whole Foods and Wild Oats, particularly the large number of cross-shopping customers— or customers at the margin — with a growing interest in natural and organic foods. Post-merger, all of these competing alternatives will remain. Based upon the evidence presented, the Court concludes that many customers could and would readily shift more of their purchases to any of the increasingly available substitute sources of natural and organic foods. The Court therefore concludes that the FTC has not met its burden to prove that “premium natural and organic supermarkets” is the relevant product market in this case for antitrust purposes.
Id. at 36.
II
In an attempt to save its merger case despite its inability to meet the test reflected in the Merger Guidelines and applied in Staples, the FTC cites marginally relevant evidence and advances seriously flawed arguments.
First, the FTC says that so-called organic supermarkets like Whole Foods and Wild Oats constitute their own product market because they are characterized by factors that differentiate them from conventional supermarkets. Those factors include intangible qualities such as customer service and tangible factors such as a focus on perishables.
This argument reflects the key error that permeates the FTC’s flawed approach to this case. Those factors demonstrate only product differentiation, and product differentiation does not mean different product markets. “For antitrust purposes, we apply the differentiated label to products that are distinguishable in the minds of buyers but not so different as to belong in separate markets.” 2B Phillip E. Ar-EEDA & HERBERT HOVENKAMP, ÁNTITRUST LAW ¶ 563a, at 385 (3d ed.2007). As the District Court noted, supermarkets including so-called organic supermarkets differentiate themselves by emphasizing specific benefits or characteristics to attract customers to their stores. See FTC v. Whole Foods Mkt., Inc., 502 F.Supp.2d 1, 24-26 (D.D.C.2007). They may differentiate themselves along dimensions such as “low price, ethnic appeal, prepared foods, health and nutrition, variety within a product category, customer service, or perishables such as meats or produce.” Stanton Expert Report ¶ 23, at 6.
The key to distinguishing product differentiation from separate product markets lies in price information. As Professors Areeda and Hovenkamp have stated, differentiated sellers “generally compete with one another sufficiently” that the prices of one are “greatly constrained” by the prices of others. Areeda & HovenkaMp, Antitrust Law ¶ 563a, at 384. To distinguish differentiation from separate product markets, courts thus must “ask whether one seller could maximize profit” by charging “more than the competitive price” without “losing too much patronage to other sellers.” Id. ¶ 563a, at 385. Here, in other words, could *897 so-called organic supermarkets maximize profit by charging more than a competitive price without losing too much patronage to conventional supermarkets? Based on the evidence regarding Whole Foods’s pricing practices, the District Court correctly found that the answer to that question is no. So-called organic supermarkets are engaged in product differentiation; they do not constitute a product market separate from all supermarkets.
Second, the FTC points to internal Whole Foods studies and other evidence showing that if a Wild Oats near a Whole Foods were to close, most of the Wild Oats customers would shift to Whole Foods. But that says nothing about whether Whole Foods could impose a five percent or more price increase and still retain those customers (and its other customers), which is the relevant antitrust question. In other words, the fact that many Wild Oats customers would shift to Whole Foods does not mean that those customers would stay with Whole Foods, as opposed to shifting to conventional supermarkets, if Whole Foods significantly raised its prices. And even if one could infer that all of those former Wild Oats customers would so prefer Whole Foods that they would shop there even in the face of significant price increases, that would not show whether Whole Foods could raise prices without driving out a sufficient number of other customers as to make the price increases unprofitable. In sum, this argument is a diversion from the economic analysis that must be conducted in antitrust cases like this. The District Court properly found that the expert evidence in the record leads to the conclusion that Whole Foods could not profitably impose such a significant price increase.[5]
Third, the FTC points to comments by Whole Foods CEO John Mackey as evidence that Whole Foods perceived Wild Oats to be a unique competitor. Even if Mackey’s comments were directed only to Wild Oats, that would not be evidence that Whole Foods and Wild Oats are in then-own product market separate from all other supermarkets. It just as readily suggests that Whole Foods and Wild Oats are two supermarkets that have similarly differentiated themselves from the rest of the market, such that Mackey would be especially pleased to see that competitor vanish. Beating the competition from similarly differentiated competitors in a product market is ordinarily an entirely permissible competitive goal. Saying as much, as Mackey did here, does not mean that the similarly differentiated competitor is the only relevant competition in the marketplace. Moreover, Mackey nowhere says that the merger would allow Whole Foods to significantly raise prices, which of course is the issue here. In any event, intent is not an element of a § 7 claim, and a CEO’s bravado with regard to one rival cannot alter the laws of economics: Mere boasts cannot vanquish real-world competition — here, from Safeway, Albertson’s, and the like. As Judge Easterbrook has explained, “Firms need not like their competitors; they need not cheer them on to success; a desire to extinguish one’s rivals is entirely consistent with, often is the motive behind, competition.” A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1402 (7th Cir.1989). And “[i]f *898 courts use the vigorous, nasty pursuit of sales as evidence of a forbidden ‘intent’, they run the risk of penalizing the motive forces of competition.” Id. “Intent does not help to separate competition from attempted monopolization....” Id.
Fourth, the FTC says that a study by its expert, Dr. Murphy, demonstrates that Whole Foods’s profit margins decreased in geographic areas where it competed against Wild Oats. But the relevant inquiry under the Merger Guidelines is prices. And Dr. Murphy did not determine whether Whole Foods prices ever differed as a result of competition from Wild Oats.
Moreover, there was only a slight difference between Whole Foods margins when Wild Oats was in the same area and when it was not. The overall difference was 0.7 percent, which Dr. Murphy himself recognized was not statistically significant. The FTC’s evidence on margins is wafer-thin and does not suffice to show that organic stores constitute their own product market.
Fifth, the FTC points to evidence that Whole Foods’s entry into a particular area, unlike the entry of conventional supermarkets, caused Wild Oats to lower its prices. Dr. Murphy’s reliance on Wild Oats’s reaction to Whole Foods’s entry is questionable. Dr. Murphy based his entire analysis on a meager two events, hardly a large sample size. In addition, Dr. Murphy’s analysis did not control for the reaction of conventional supermarkets to Whole Foods’s entry. In other words, he assumed that the relevant product market was so-called organic supermarkets (the point he was trying to prove) and therefore assumed that all changes in Wild Oats’s prices were directly caused by Whole Foods’s entry. But if conventional supermarkets also lowered prices to compete with Whole Foods when Whole Foods entered, Wild Oats’s price decreases may well have been due to the overall reduction in prices by all supermarkets in the area. If that were true, the relevant product market would obviously be all supermarkets, not just so-called organic supermarkets. Dr. Murphy’s analysis never confronted that possibility or the complexity of how competition works in this market; he simply assumed the conclusion and reasoned backwards from there.
Moreover, the fact that Whole Foods and Wild Oats went toe-to-toe on occasion does not mean that they did not also go toe-to-toe with conventional supermarkets, which is the key question. And it is revealing that despite having access to the necessary data for six such events, Dr. Murphy did not analyze the effect of a Wild Oats exit on Whole Foods’s prices. As Dr. Scheffman wrote: “A number of [Wild Oats] stores have closed_ [Dr. Murphy] has done no analysis to assess the effects of those store exits in the local shopping areas.... This is a curious omission, since such evidence, if reliable and reliably analyzed, would be relevant to the issue of what happens in local market areas in which a [Wild Oats] store closes.” Scheffman Rebuttal ¶ 63, at 21.
The bottom line is that, as the District Court found, there is no evidence in the record suggesting that Whole Foods priced differently based on the presence or absence of a Wild Oats store in the area. That is a conspicuous — and all but disposi-tive — omission in Dr. Murphy’s analysis and in the FTC’s case.
Sixth, the FTC cites the openings of three Earth Fare stores near Whole Foods stores in North Carolina, which caused decreases in Whole Foods’s prices in those areas. But soon after those entries, Whole Foods’s prices returned to normal levels. So the record hardly shows the sort of “nontransitory” price changes that are the touchstone of product-market definition. See Merger Guidelines § 1.11. A price in *899 crease ordinarily must last “for the foreseeable future,” id., considered by some to be more than a year, to qualify as “non-transitory.” See Aeieeda & Hovenkamp, Antitrust Law ¶ 537a, at 290. Moreover, the entry of a Safeway store in Boulder, Colorado, had a similar short-term impact on Whole Foods, indicating that whatever inference should be drawn from the Earth Fare entries cannot be limited to so-called organic supermarkets but rather applies to conventional supermarkets.
The FTC’s reference to Earth Fare mistakenly focuses on a few isolated trees instead of the very large forest indicating a competitive market consisting of all supermarkets. In short, I fail to see how Whole Foods’s temporary price changes to compete against three Earth Fare stores in North Carolina could possibly be a hook to block this nationwide merger of Whole Foods and Wild Oats.[6]
Ill
There are many surprising aspects of today’s decision. But perhaps most startling is that the majority opinion reverses the District Court based primarily on an argument that the FTC has not made to this Court. In reaching its decision, the majority opinion relies on a distinction between marginal consumers and core consumers. But the FTC never once referred to, much less relied on, the distinction between marginal and core consumers in 86 pages of briefing or at oral argument. The terms “marginal consumer” and “core consumer” are nowhere to be found in its briefs. It’s of course not our usual role to gin up new arguments that the appellant did not make on appeal. But perhaps this is no-harm, no-foul: After all, the core-consumer theory advanced by the majority opinion appears to be just a warmed-over version of the FTC’s theory discussed above that most Wild Oats customers would switch from Wild Oats to Whole Foods in the wake of a merger. Again, however, the question for antitrust purposes is whether the merged entity could impose a five percent or greater price increase for the foreseeable future without losing so many customers as to make the price increase unprofitable. The majority’s focus on marginal versus core consumers elides that key question. Sure, there may be consumers who are so wedded to Whole Foods that they’ll pay much higher prices. But are there enough such that Whole Foods can profitably impose a significant and nontransitory price increase? That’s the question, and as explained above and as found by the District Court, the record convincingly demonstrates that the answer is no.
IV
In the end, the FTC’s case is weak and seems a relic of a bygone era when antitrust law was divorced from basic economic principles. The record does not show that Whole Foods priced differently based *900 on the presence or absence of Wild Oats in the same area. The reason for that and the conclusion that follows from that are the same: Whole Foods competes in an extraordinarily competitive market that includes all supermarkets, not just so-called organic supermarkets. There is no good legal basis to block further implementation of this merger.
* * *
I respectfully dissent.

. My colleagues, and especially the concurrence, hint that the FTC need not demonstrate a likelihood of success to obtain a preliminary injunction in a § 7 case. But consistent with the text of the governing statute, § 13 of the FTC Act, we have always held that the FTC must show a likelihood of success to obtain a preliminary injunction in a § 7 case. To conclude otherwise would be to enhance the FTC’s power to torpedo mergers well beyond what Congress has authorized.

. The concurrence disparages the evidence about Whole Foods’s prices, calling it "all-but-meaningless” and implicitly suggesting that Whole Foods manipulated its prices just for the expert study. Concurring Op. at 887. But the concurrence offers no evidence for that suggestion.

. According to the concurrence, the FTC’s expert purported to say that Whole Foods could impose a five percent or greater price increase because of the number of Wild Oats customers who would switch to Whole Foods rather than conventional supermarkets. Concurring Op. at 884-85. But that bare assertion was unsupported and was premised on the notion that organic supermarkets are a separate product market. That premise is of course the issue in dispute. That no doubt explains why the FTC never even mentioned this aspect of its expert’s report in the argument section of its opening brief.

. As two antitrust commentators perceptively stated:
The basic problem with the FTC's position in Whole Foods was that it lacked the pricing evidence it had in Staples, which showed that customers did not go elsewhere if the office superstores increased their prices. Whole Foods is an attempt by the FTC to persuade a court that if you take a CEO’s statements about a merger and stir it in with evidence showing the existence of several “practical indicia” from Brown Shoe, the resulting mixture should trump objective evidence about how customers would react in the event of a price increase. It was not successful, and the court’s decision underscores the dominant influence of economic evidence in merger cases today.
Carlton Varner & Heather Cooper, Product Markets in Merger Cases: The Whole Foods Decision (Oct.2007), www.antitrustsource. com.